# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 03-1760/03-3086

_____

| | | |
|---|---|---|
| Jean Mouelle; Germaine Mouelle, | * | |
| | * | |
| Petitioners, | * | |
| | * | |
| v. | * | Petitions for Review of Orders |
| | * | of the Board of Immigration Appeals. |
| Alberto Gonzales,[1] Attorney General | * | |
| of the United States, | * | |
| | * | |
| Respondent. | * | |

_____

Submitted: October 21, 2004
Filed: July 29, 2005

_____

Before BYE, BEAM, and GRUENDER, Circuit Judges.

_____

BEAM, Circuit Judge.

Jean and Germaine Mouelle ask us to grant a petition for review regarding two Board of Immigration Appeals (BIA) decisions rendered in their removal proceedings. We deny the petitions.

_____

[1]Alberto Gonzales has been appointed to serve as Attorney General of the United States, and is substituted as respondent pursuant to Federal Rule of Appellate Procedure 43(c).

## I.      BACKGROUND

Jean Mouelle, a native and citizen of the Republic of Congo, entered the United States in 1989 as a J-1 exchange visitor so he could pursue masters and doctoral degrees from the University of Idaho. His wife, Germaine, also a native and citizen of the Republic of Congo, entered the United States as a dependent of an exchange visitor. The Mouelles did not return to the Republic of Congo when their nonimmigrant visas expired.

In May 1996, Jean filed an application for asylum and withholding of removal, naming Germaine as a dependent.[2] In May 1997, while their asylum application was pending, Jean was presented with the opportunity to go to Canada for field research and to assist a class that he was teaching. Cognizant of their immigration status and the likelihood that they would not be able to reenter the United States if they went to Canada, the Mouelles contacted the Immigration and Naturalization Service[3] and applied for advance parole, which would allow them to reenter the United States. The INS granted that request. The Mouelles left the United States on May 31, 1997, and reentered a day later, on June 1, 1997, at Eastport, Idaho, pursuant to their advance parole.

---

[2]Jean also came very close to obtaining lawful residency in 1994 when he won the diversity visa lottery. But, as a J-1 nonimmigrant, Jean was required to obtain a "no objection" letter from the Congolese government in order to relieve him of the J-1 two-year foreign residency requirement under 8 U.S.C. § 1182(e). Though Jean ultimately did get the "no objection" letter, he did not get it before his ability to obtain a diversity visa had expired.

[3]In March 2003, the functions of the Immigration and Naturalization Service were transferred to the newly formed Department of Homeland Security (DHS). See Homeland Security Act of 2002, 6 U.S.C. §§ 101 et seq.

On April 15, 1998, the INS commenced removal proceedings against the Mouelles, serving them with notices to appear before an immigration judge. At the first removal hearing in August 1998, the INS realized the allegations contained in the notices to appear were inaccurate. The Mouelles, however, agreed to allow the INS to add additional removal charges. Those new charges sought removal under 8 U.S.C. §§ 1182(a)(7)(A)(i)(I) & (B)(i)(II), essentially for the Mouelles' failure to present proper documentation when they reentered the United States in June 1997. At the next removal hearing in October 1998, the Mouelles admitted that they were inadmissible under subsection (B)(i)(II) when they sought reentry in June 1997, and the immigration judge found that they were also inadmissible under subsection (A)(i)(I). In lieu of removal, Jean renewed his request for asylum and withholding of removal, which apparently had not yet been addressed by the INS. The immigration judge set the matter for an evidentiary hearing in August 1999.

At the evidentiary hearing in August 1999, the immigration judge denied the Mouelles' claims for asylum and withholding of removal. After finding that the Mouelles were removable, the immigration judge granted them the privilege of voluntary departure so long as they depart before October 5, 1999, and post departure bonds.

The Mouelles appealed the immigration judge's ruling to the BIA. The BIA affirmed the immigration judge's decision in February 2003. But because the Mouelles had not posted their departure bonds, the BIA revoked their privilege of voluntary departure, making the Mouelles immediately removable.

During the three-and-a-half years that their appeal was pending, the Mouelles sought employment-based visas. Jean filed an I-140 Immigrant Petition for Alien Worker on April 28, 2001. That petition was denied in November 2001, because Jean had not shown that it was in the nation's interest for the Attorney General to waive the job-offer requirement of 8 U.S.C. § 1153(b)(2)(B). Germaine had an I-140

Immigrant Petition for Alien Worker filed on her behalf by her employer, Presbyterian Homes and Services, Inc. That petition was approved in August 2002 under 8 U.S.C. § 1153(b)(3)(A)(i) or (ii) (skilled workers or professionals).

The Mouelles did not try to adjust their immigration status based on Germaine's approved I-140 petition until March 2003, after the BIA had affirmed the immigration judge's decision. In March 2003, the Mouelles filed applications to adjust their immigration statuses under 8 U.S.C. § 1255(i). And in May 2003, the Mouelles filed a motion to reopen their removal proceedings and remand the matter to the immigration judge so that they could apply for adjustment of status.

In July 2003, the BIA denied the Mouelles' motion to reopen, stating that they "are ineligible for adjustment of status because they are 'arriving aliens' in removal proceedings, notwithstanding the approved [I-140] visa petition."

The Mouelles were scheduled to be removed from the United States on May 7, 2003. We have stayed their removal, pending the resolution of their petitions for review.

The Mouelles have two pending petitions for review that have been consolidated here. The first, No. 03-1760, concerns the BIA's February 2003 denial of the Mouelles' asylum application. The second, No. 03-3086, concerns the BIA's July 2003 denial of the Mouelles' motion to reopen the removal proceedings.[4]

---

[4]The Mouelles also filed a motion for reconsideration with the BIA in August 2003, asking the BIA to reconsider its July 2003 denial of their motion to reopen. The motion for reconsideration was denied in December 2003. The Mouelles have not petitioned for review of that decision, so it is not before us. See Raffington v. INS, 340 F.3d 720, 722 (8th Cir. 2003).

## II. DISCUSSION

### A. No. 03-1760: Asylum and Withholding of Removal

With regard to the initial BIA decision in February 2003, denying their claims for asylum and withholding of removal, the Mouelles argue only that the immigration judge violated their Fifth Amendment procedural due process rights.[5] The Mouelles did not present the due process issue to the BIA in their appeal or in their motion to reopen. Thus, we are without jurisdiction to consider it. Sayaxing v. INS, 179 F.3d 515, 522-23 (7th Cir. 1999). And, even if we had jurisdiction, the Mouelles' due process claim fails because they have not addressed, let alone established, prejudice—"that the outcome of the proceeding may well have been different had the due process violation not occurred." Ismail v. Ashcroft, 396 F.3d 970, 975 (8th Cir. 2005).

### B. No. 03-3086: Adjustment of Status

All of the Mouelles' remaining arguments address the BIA's July 2003 denial of their motion to reopen the removal proceedings to allow them to apply for adjustment of status under 8 U.S.C. § 1255(i). "We have jurisdiction to review the BIA's denial of the motion to reopen for abuse of discretion." Sidikhouya v. Gonzales, 407 F.3d 950, 951 (8th Cir. 2005).

---

[5]Specifically, the Mouelles argue that the immigration judge failed to give them sufficient time to fully present their asylum and withholding-of-removal claims, interrupted Jean's testimony with questioning, "failed to elicit specific and detailed testimony that was material and significant," drew "odd conclusions before testimony was even completed," interrupted Jean's attorney, and cut off counsel's closing argument.

The BIA refused to reopen the Mouelles' removal proceedings because they were "arriving aliens in removal proceedings" under 8 C.F.R. § 1245.1(c)(8)[6] and were thus ineligible to apply for relief under 8 U.S.C. § 1255(i). The Mouelles make two arguments: (1) they were in fact eligible to adjust status under the regulations, and (2) if they were not, the regulations are invalid.

### 1. Status-Adjustment Eligibility Under the Regulations

As a matter of regulatory construction, the BIA's conclusion was correct. Section 1245.1(c) of the regulations lists certain categories of aliens who are "ineligible to apply for adjustment of status to that of a lawful permanent resident alien under section 245 of the Act [8 U.S.C. § 1255]." And section 1245.10(b) of the regulations—which deals specifically with adjustments under 8 U.S.C. § 1255(i)—incorporates those exclusions through its reference to section 1245.1(b), which, in turn, references section 1245.1(c). One of the section 1245.1(c) categories of ineligible aliens is "[a]ny arriving alien who is in removal proceedings pursuant to . . . section 240 of the Act [8 U.S.C. § 1229a]." 8 C.F.R. § 1245.1(c)(8).

The Mouelles were in removal proceedings under 8 U.S.C. § 1229a when they made their motion to reopen. But they argue that the BIA abused its discretion by denying their motion based on 8 C.F.R. § 1245.1(c)(8) because they are not arriving aliens. The term "arriving alien" is defined as

---

[6]The regulations were duplicated and renumbered while the Mouelles' proceedings were pending. As part of the Homeland Security Act of 2002 and the transfer of immigration responsibilities to the DHS, the regulations were duplicated from Chapter I, renumbered in the 1000 series, and placed in Chapter V of Title 8. We cite to the Chapter V regulations, though the same regulations can be found in Chapter I. For instance 8 C.F.R. § 1245.1(c)(8) matches 8 C.F.R. § 245.1(c)(8).

an applicant for admission coming or attempting to come into the United States at a port-of-entry . . . . An arriving alien remains such even if paroled pursuant to section 212(d)(5) of the Act [8 U.S.C. § 1182(d)(5)], *except that . . . an alien who was granted advance parole which the alien applied for and obtained in the United States prior to the alien's departure from and return to the United States, shall not be considered an arriving alien for purposes of section 235(b)(1)(A)(i) of the Act* [8 U.S.C. § 1225(b)(1)(A)(i)].

8 C.F.R. § 1001.1(q) (emphasis added). The Mouelles argue that their receipt of advance parole before going to Canada qualified them for the italicized exception. It did, but that exception is for the limited purpose of 8 U.S.C. § 1225(b)(1)(A)(i), which requires immigration officers to order some arriving aliens immediately removed "without further hearing or review." In other words, under the regulations, the Mouelles were arriving aliens when they sought reentry and their parole into the United States did not generally affect that status. But the italicized language does preclude expedited removal in their cases because they were granted advance parole. The regulation does not, however, allow aliens arriving with advance parol to shed their arriving-alien status for the purpose of adjusting immigration status. Rather, the quoted regulation preserves that status notwithstanding the aliens' arrival. And if such aliens are in removal proceedings when they first try to adjust status,[7] the regulations make them ineligible. So the Mouelles were arriving aliens in removal proceedings and were thus barred from adjusting their statuses.

### 2.    Validity of 8 C.F.R. § 1245.1(c)(8)

The Mouelles argue, alternatively, that 8 C.F.R. § 1245.1(c)(8) is invalid. After this case had been argued and submitted, Succar v. Ashcroft, 394 F.3d 8 (1st Cir. 2005), was decided. The Succar court concluded that 8 C.F.R. § 1245.1(c)(8) was

---

[7]An arriving alien who seeks to *renew* an adjustment application in removal proceedings can do so under certain circumstances. See 8 C.F.R. § 1245.2(a).

inconsistent with 8 U.S.C. § 1255(a)[8], and was thus invalid under the first step of Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., because "Congress ha[d] directly spoken to the precise question at issue."  467 U.S. 837, 842 (1984) (quoted in Succar, 394 F.3d at 22).  We allowed the parties to supplement their briefs, and we accepted an amicus brief in support of the Mouelles from the American Immigration Law Foundation.

We respectfully disagree with the First Circuit's decision in Succar.  Succar rested on the notion that Congress had explicitly determined what classes of aliens were and were not eligible to apply for discretionary adjustment-of-status relief.  394 F.3d at 29.  Given that congressional judgment—constituting, in the court's opinion, a clear expression of its intent—the court held that the regulation was invalid under the first step of Chevron because it added eligibility requirements.  Id.  And, even though the statute vested the Attorney General with full discretion to grant or deny adjustment-of-status relief, the court concluded that the regulation could not properly be characterized as a rule-based exercise of that discretion.  Id.

We do not believe 8 C.F.R. § 1245.1(c)(8) is properly evaluated under Chevron's first step, given the discretionary nature of the relief available under 8 U.S.C. § 1255.  While Congress surely did speak to eligibility in the statute, it left the question whether adjustment-of-status relief should be granted to the Attorney General's discretion.  8 U.S.C. § 1255(a) ("[t]he status of an alien who was inspected and admitted or paroled . . . *may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe*" (emphasis added)); id. § 1255(i)(2) ("the Attorney General *may* adjust the status of the alien") (emphasis added).  Administrators vested with such discretion may exercise that discretion by

---

[8]Notably, the Mouelles did not seek to adjust status under section 1255(a). They sought to adjust under section 1255(i). Nonetheless, the reasoning of the Succar court, if correct, is broad enough to invalidate the regulation as inconsistent with the statutory scheme at issue.

rule or on a case-by-case basis. <u>Bellis v. Davis</u>, 186 F.3d 1092, 1094-95 (8th Cir. 1999). And we can find no basis upon which to conclude that this regulation does not embody the Attorney General's decision not to afford discretionary relief to the delineated class of aliens—arriving aliens in removal proceedings. Attorney General Reno stated this discretionary-relief basis for the regulation when it was proposed. "[T]he Attorney General has determined that she will not favorably exercise her discretion to adjust the status of arriving aliens who are ordered removed pursuant to section 235(b)(1) of the Act or who are placed in removal proceedings under section 240 of the Act." 62 Fed. Reg. 444, 452 (Jan. 3, 1997). And she again stressed the discretionary nature of status adjustments when the interim rule issued:

> Some commenters objected to the policy statement contained in the proposed rule that amended § [1]245.1(c)(8) and indicated that, as an exercise of discretion, the Attorney General would not adjust the status of arriving aliens . . . in proceedings under section 240 of the Act.
>
> . . . .
>
> In response to the commenters who suggested this policy exceeded the Attorney General's statutory authority, it is noted that section 245 of the Act [8 U.S.C. § 1255] clearly and unambiguously states that adjustment of status is a discretionary decision, subject to such regulatory limitations as the Attorney General may prescribe.

62 Fed. Reg. 10312, 10326-27 (Mar. 6, 1997). As Judge Friendly wrote with regard to 8 U.S.C. § 1255(a), "We are unable to understand why there should be any general principle forbidding an administrator, vested with discretionary power, to determine by appropriate rulemaking that he will not use it in favor of a particular class on a case-by-case basis . . . ." <u>Fook Hong Mak v. INS</u>, 435 F.2d 728, 730 (2d Cir. 1970); <u>see also</u> <u>Bellis</u> 186 F.3d at 1095 (concluding that the Bureau of Prisons validly exercised its discretion to grant early release by "identifying additional categories of

inmates who are ineligible for the early-release program"), aff'd, Lopez v. Davis, 531 U.S. 230, 343-44 (2001).

Even though 8 C.F.R. § 1245.1(c)(8) says that the particular class of aliens at issue is "ineligible to apply for adjustment of status," that does not change matters. The Succar court concluded this was of primary significance, finding that Congress had unequivocally stated that statutorily eligible aliens must be allowed to apply for status adjustment. 394 F.3d at 28. But why should the Attorney General be forced to exercise his discretion through rules that speak only to the ultimate relief rather than eligibility? If the Attorney General decided that arriving aliens in removal proceedings will not be given adjustment-of-status relief (as she clearly did in promulgating this rule), and if that decision does not contravene the statute (as we conclude it does not), then it makes little sense to invalidate this regulation simply because it speaks in terms of eligibility. See Lopez, 531 U.S. at 243-44 ("Even if a statutory scheme requires individualized determinations, which this scheme does not, the decisionmaker has the authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority. . . . [C]ase-by-case decisionmaking in thousands of cases each year, . . . could invite favoritism, disunity, and inconsistency." (citations and quotations omitted)).

The Succar court concluded that INS v. Cardoza-Fonseca, 480 U.S. 421 (1987), established the difference between statutory eligibility and the Attorney General's discretion to grant relief. It then took that premise and concluded that if Congress had spoken to eligibility, then an administrator with discretion to grant relief cannot impose eligibility requirements that are not found in the statute. We cannot find support for the latter premise in Cardoza-Fonseca. The Court in Cardoza-Fonseca did emphasize the difference between eligibility and the discretionary decision to grant relief, but it did so in a much different context than that presented here.

-10-

The BIA in Cardoza-Fonseca had construed the statutory eligibility standard for asylum (a form of discretionary relief) as requiring the same showing—a clear probability of persecution—as the statutory eligibility standard for withholding of deportation (a form of relief that must be given to an eligible alien). Id. at 443. The Court reasoned that the BIA's construction did not fit the statutes because the difference between the nature of the relief available under each—discretionary versus mandatory—evinced a congressional intent that the eligibility standard for discretionary asylum would be less demanding than the eligibility standard for mandatory withholding. Id. at 443-44. But the Court did not hold that the Attorney General could not by regulation determine who among the class of aliens that is statutorily eligible for discretionary relief would or would not be afforded such relief. It simply held that the BIA's interpretation of the statute in that case failed because Congress did not intend the heightened mandatory-withholding showing to apply to discretionary asylum.

This case is quite different. First, the regulation at issue does not purport to interpret statutory eligibility standards, but rather rests on the discretionary authority that Congress explicitly gave the Attorney General to grant adjustment-of-status relief. And, even if we take Cardoza-Fonseca as somehow relevant to our inquiry, there is no congressional intent evinced by a similar mandatory-relief provision that limits the Attorney General's ability to determine by regulation which statutorily eligible aliens will get the relief that he has the power, but not the duty, to grant.

As a rule-based exercise of the Attorney General's discretion to allow status adjustments, we conclude section 1245.1(c)(8) of the regulations is not invalid as contrary to the statute. This does not mean, however, that the regulation is necessarily valid. To be valid, such gap-filling regulations must be "reasonable in light of the legislature's revealed design." Lopez, 531 U.S. at 242 (quotation omitted); accord Fook Hong Mak, 435 F.2d at 731 ("reasonably related to the statutory scheme"). The class of aliens delineated by 8 C.F.R. 1245.1(c)(8) consists

-11-

of (1) arriving aliens who are (2) in removal proceedings. As mentioned, arriving aliens are aliens who seek admission to the United States at a port-of-entry. The Attorney General's stated reasons for delineating this class of aliens clearly show that the classification is reasonable under the statutory scheme. See 62 Fed. Reg. at 10312-13 & 10326-27. And arriving aliens' placement in removal proceedings is a characteristic that is a reasonably sound basis for choosing not to grant relief under 8 U.S.C. § 1255(i).[9] Applications for such relief would necessarily lengthen removal proceedings (much like they have here), and expediency was one of the goals of the 1996 amendments to the Immigration and Nationality Act. See S. Rep. No. 104-249, 1996 WL 180026, at *2 (Apr. 10, 1996). Thus, we conclude the regulatory bar to status adjustment contained in 8 C.F.R. § 1245.1(c)(8) is valid and the BIA did not abuse its discretion by denying the Mouelles' motion to reopen on that basis.

We have considered all of the Mouelles' other arguments that are properly presented by their petitions for review, and we find them without merit.

---

[9]The court in Succar opined that the relevant characteristic—placement in removal proceedings—effectively barred most aliens who had been paroled from adjusting status because most paroled aliens were in removal proceedings. 394 F.3d at 18. Thus, the court concluded, the regulation was contrary to 8 U.S.C. § 1255(a) because paroled aliens were among those eligible to adjust status under the statute. As an evidentiary matter, we cannot conclude that the regulation bars most paroled aliens from adjusting status. Unlike the court in Succar, we have not been "informed," id., of that fact. And in this case the Attorney General cites DHS statistics suggesting that only about two to three percent of parolees who entered the United States in 2003 have been placed in removal proceedings. Resp. Supp. Br. at 13 n.1. In fact, the INS did not initiate removal proceedings against the Mouelles until April 15, 1998, over ten months after the Mouelles were paroled into the United States. Moreover, even if we assumed that most aliens paroled into the United States were placed in removal proceedings, 8 U.S.C. § 1255 does not show a congressional intent to vest a few, most, or all paroled aliens with the right to adjust their status. Relief remains discretionary.

## III.  CONCLUSION

Accordingly, we deny the petitions.

BYE, Circuit Judge, dissenting.

I respectfully dissent.  I would hold 8 C.F.R. § 1245.1(c)(8) is invalid for the reasons articulated in Succar v. Ashcroft, 394 F.3d 8 (1st Cir. 2005).  Accordingly, I would vacate the removal orders and remand for further proceedings.

_____